May it please the Court, Austin Garner on behalf of Security Service Federal Credit Union. Good morning. This appeal originally was solely relating to coverage provided under a title insurance policy. The appellees raised an additional issue, which I'd like to address at the outside, which is a question of standing or the real party in interest. But I believe that issue can be easily disposed of by looking to the Sixth Circuit case, which was submitted through the Rule 28J letter, wherein the prudential standing of First American Title to challenge a purchase and assumption agreement of the same nature and quality as the one that's at issue here was denied. Did it contain the same provision that the liquidating agent shall retain, for the benefit of the liquidation estate, the sole right to pursue claims?  Did it contain that same language? There was a similar language, and in that case, specifically, First American Title interpreted the transfer of the loans, which was equally done here, that the transfer of the loans containing all right, title, and interest. First American argued specifically that the title insurance policies, the same type of title insurance policies which are at issue here, were transferred. And in that case, First American argued that it was an adjunct agreement, a closing protection letter that could not be retained to the FDIC in that instance, so that the transfer was a complete and total transfer of the right, title, and interest. If, in fact, standing is an issue and that the purchase and assumption agreement were not, did not completely transfer the rights to security service, then this really is an issue under Rule 17, Federal Civil Procedure 17, wherein the real party in interest needs to be determined, and if the real party in interest has not been joined in the action, then an opportunity to join that real party needs to be afforded. So if that threshold question has to be addressed, then the proper action is to remand and allow the joinder of the NCUA into this proceeding. If there aren't any further questions on that, I'll move on to the other issue there presented. Does the failure to have the report, the agency report, render the title unmarketable within the definition of the policy? Yes, Your Honor. Tell us how. Excuse me? Tell us how. First American title actually tells us how, in that the context of their brief, they state the title is unmarketable if the existence of a given circumstance would permit a reasonable purchaser to lawfully refuse to complete a contract for sale. That is exactly what the SLA does. They cite to Mertens and Bergensen and Mellinger v. Tycor. Unmarketability necessarily requires the title to the property to be forever vested in the insured. Actually, all of the cases which are cited by the appellees to state that there's no claim or that the court relied on are an attack on the title by a third party. Well, in an unmarketability claim, it isn't an attack of the title. But not all unmarketability of property pertains to a defect in title. There can be many reasons for unmarketability. There can be. Are there hurdles that don't relate to a defect in title? And my question to you is the following, and I know you don't concede this in any way, but if we were to disagree with you on the marketability or on the question of defect in title, that is if we were to hold as a matter of law that there was no defect in the title, do all of your claims fall or are there any that would remain without an underlying theory that there's a title defect? If there is no title defect, the fraud claims still stand to the extent that the condition which is preventing the sale of the property, and, again, this is the sale of the property, not whether it's marketable or not, but there's just no possibility of sale, was a condition which was created and known to have been created by First American at the time that they issued the title insurance policies. But assuming we got that far, we'd have to remand, would we not? Yes, that's correct, because that is a question of fact. The court did not address any issues as it related to fraud other than the statute of limitations and knowledge. Have all of these lots been foreclosed upon? All of the lots were foreclosed upon, yes, Your Honor, except for one. There were 13 lots in the original subdivision. Twelve were financed and foreclosed upon by security service. One lot remains unforeclosed upon. As to those 12, is your client the owner? Yes, Your Honor. They are as a result of the foreclosure. So they're now the landowner? That's correct. Couldn't they cure the problem? They're not required to cure the problem. That was not my question. Could they not cure the problem? Actually, they cannot cure the problem because the contiguous lot, the 13th lot, is not in their ownership. In order to cure the problem of the lack of SLA, the final public report, there's a requirement to have all of the lots which were transferred and that needed to be sold out. They don't own the 13th lot. The 13th lot, some other party who had subsequent financing on it. That lot was not foreclosed upon by security service. Couldn't your client have made an effort? Could my client have made that effort? Certainly. But there's no requirement under the title insurance policy for them to cure a defect. I understand that. But you were just asked the questions about what claims may remain if it's determined that there's no defect in title. And wouldn't you, and let's assume hypothetically that you did own all 13 lots and that you went to the time, your client, the time, trouble, and expense of curing the problem, wouldn't you have a contract and or fraud claim based on that effort and that expense? Yes, Your Honor. Anything that stems from the fact that we don't have the SLA and whatever efforts it takes to cure that defect. So tell us why you didn't do that. Why didn't we do that? Yeah. Because we required a title insurance policy where we were indemnified for just this circumstance. We acquired the title insurance policy. You have no obligation to try to mitigate your damage. Well, we have an obligation under the contract, actually, to first tender to the title insurance policy and allow them to elect their remedies. So you did that and they refused, right? And they thereafter refused, and we brought our claim and are litigating that claim. But, see, that's what's confusing to me about the fraud claim, because it all comes back in your explanation to an alleged defect in title. And I don't understand how, if we were to hold that there has never, if we were to hold, and I understand you don't agree with this, if we were to hold that there has never been a defect in title from day one, what does the fraud claim stand upon? Well, if there's no defect in title, if we can sell, then we haven't been injured, Your Honor. That's correct. If there's nothing that exists. So if, as a matter of law, we were to conclude that from day one there's never been a defect in title, then it seems to me that all of your claims would have to go away. If there is no defect in title, then we erroneously made a claim under the title insurance policy. We erroneously made a claim for fraud. However, Your Honor, that's a fact which just doesn't exist. No, I understand that that's counter to your argument, but it just, I had a hard time reading the complaint and seeing how the fraud allegations were completely independent of the title defect issue, because it is, after all, a title insurance policy. So if there's no title problem, it seemed like it all would have to go away. Do you take the position that you have a claim against First American for failure to obtain the approval that was required? The claim is not for the fact that they failed to obtain it. It's the damages that they can injure. Failed to disclose it. Correct. Well, no, actually, Your Honor, under the title insurance policy, first there's the question as to whether or not the insuring provision has been triggered. And in this case, the insuring provision insured a fee interest in the property. A fee interest includes a right of alienability. The fee interest may be something less than a full fee simple, but that's not what's insured. A fee is insured. Alienability is included within that. And our inability to sell then triggers the specific insuring provision for marketability. And if they insure marketability, and we can't sell, then we're covered. So to go back to my earlier question to you then, if there's no title defect but you can't market the property, it's related to something else that isn't insured. I don't believe you can separate those two, Your Honor. If we can sell, then there's not a title defect affecting our capacity to sell. Well, but even if there's no title defect, there may be other reasons why you can't sell. Certainly, Your Honor, but that's not the case here. And if you look at the Hawking case, they can sell the property. If you look at the Dollinger case, they can sell the property. Under the Nishishima case, all of the cases which are relied upon by the appellees, they can sell the property. They may have to sell it for less. Security Service can't sell the property. That's what we received the fee simple interest in or insured in. If we could sell the property, we wouldn't be here. But it seems to me you're confusing title with marketability. No, Your Honor. Title. Title. You've already said that. But we have title. Exactly. And this is what distinguishes us from the other cases. We have perfect title except for one very simple basic thing. We can't sell it to anyone. And if you can't sell it, that's one of the insuring provisions. They insured us for marketable title. We don't have marketable title. No, no, no. There's a difference between marketable title and marketability of the property to which you hold title. Those are two different concepts. Yes, Your Honor. And if you look at Hawking, Hawking had an exclusion which was applied which specifically applied to land use. Nishishima, same thing. Dollinger is a completely different case wherein in order to apply Dollinger to our case, you're required to merge the seven title insurance policies or to sell all of the or to merge all 12 title insurance policies and read them as one contract, which is not the case, or for us to sell all 12 properties, which is not required under the insuring provision. To read the Dollinger to require us to sell all the lots in bulk, I defy you to look in the contract or to find case law that requires under that contract that we go outside the scope of the individual title insurance policy. And then go out and acquire all of the other lots so that we can sell them. That's not what the title insurance policy affords it. If the title insurance company believes that defect can be cured that way, that's within their right to do it. It's not our requirement as the insured. The other lot, correct? Well, no. Actually, Your Honor, in this instance, we have 12 separate causes of action for breach of contract. We have 12 separate contracts. We have 12 separate titles. You cannot force us to merge those contracts into one or to sell the lots in bulk. We could have filed 12 separate suits in district court and pursued 12 separate breach of contract actions. For economy, they were all brought together because the same contract is at issue and the same breach is at issue. But the remedy is different. And you can't force us to have a remedy under them as though they're one if the contracts are separate. Counsel, you have about three minutes if you'd like to save some time for a follow-up. If there are no further questions, I certainly will. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Ryan Squire on behalf of Appellee First American Title Insurance Company. I'd like to start with the issue of unmarketability. The Court's questions were focusing in on exactly the issue as First American sees it, and that is the marketability of the title versus the saleability or marketability of the land itself. And as the Hawking case explains, as Lickmill explains, Dollinger, Nishiyama, the other cases, Elysian, title itself in this case is perfect. There's no problem. Playwood contends that it has to comply with government regulations in order to be able to sell the property. That's not a title defect. Plaintiff asserts that it cannot sell the lots. That's not true. It needs to comply with government regulations. And as the Nishiyama case says toward the end of that opinion, the fact that somebody, an insured, might be required to comply with reasonable government regulations respecting the use and sale of property does not render the title unmarketable. Plaintiff has fee title here. Do you not also have a provision in your policy that excludes this very situation? Absolutely, Your Honor. Yes. Provisions 1A and 1B of the exclusions specifically refer not only to separation of land, which deals with the subdivision laws, as we pointed out in the briefs, but then 1B says any other police power. The point here is that the exercise of the police power is not something that is insured by the title insurance company. And I want to focus in on just one point here. The unmarketability claim that plaintiff raises is based upon Rindelsbach's failure to obtain a final public report. And the plaintiff asserts that on the date the policies were issued, there was a breach of the policies and the title was unmarketable at that moment in time. Well, let's look at why title might have been unmarketable under plaintiff's theory. The theory is that the buyers or somebody could have rescinded for failure to comply with the subdivided lands act. That rescission, right to rescind, was extinguished and terminated when plaintiff foreclosed on the lots. No one can ever again challenge Rindelsbach's failure to obtain a final public report. So what plaintiff is really saying is that now that it has acquired the lots, it must now comply with government regulations respecting use of land. Did your client at one point have some obligation in connection with obtaining the public report?  Our client was at one point what's known in the industry as the single responsible party, which is the single point of contact for the Department of Real Estate for processing paperwork. So responsible doesn't mean you were supposed to do it. That's correct, Your Honor. That's exactly right. Interesting choice of words. It is. It's selected by the government. And, in fact, I may point the Court to declarations in that regard in the record at ER 697, 698, and 864 to 865. Now, when did your client first learn of the problem? Our client first learned of the problem, that I'm aware of, when plaintiff tendered the claim in 2010. Not before. That's correct, yes. Our client was originally designated as a single responsible party for owners in the chain before Rindelsbach, Matt Coe and Gilger. So our client was assisting those owners of the property. And then Rindelsbach comes along. First Americans not involved with Rindelsbach, as I think I just mentioned in the insights to the record, those declarations explain that Rindelsbach never contacted First American Title. In fact, Mr. Rindelsbach said the same thing at his deposition. And this can also be found at 693 of the record and 1102 and 1103. Rindelsbach never contacted First American. First American didn't know Rindelsbach was out there. And, in fact, as explained in the declarations that were submitted and the evidence that was submitted, the developers can change who the single responsible party is at any point in time. They don't have to tell the prior single responsible party that they've been fired or that somebody's been replaced with them. In other words, single responsible party, again, doesn't mean they're responsible. It's simply a point of contact for the convenience of the department. Like a registered agent sort of? Well, in a sense, I guess, yes, exactly. The DRE says we want to know that we can communicate with one person. We don't want to have to worry about ten different people communicating with us. We want to communicate with one person and we want to be able to give notices to that person. In that sense, yes, Ron. If the DRE had notified your client that there was no public report, this is hypothetical, and your client had failed to tell the landowner, would they have been responsible? I don't think so, no. They didn't have that responsibility. No, Your Honor, and I'll say the reason. Like a post office box with no forwarding address. Well, that's certainly something. Is that what you're saying? Well, what I am saying is that under the law in California, there is no obligation. Let's assume that the lack of the report does render title unmarkable. It does not, but let's assume that it did. The law in California, as established in the statutes, insurance code 12340.11, Siegel case, Southland, Seufer, et cetera, all explain that the title insurer has no obligation to disclose matters affecting title. The title insurance policy itself is a contract of indemnity. There is no claim, and this gets to the fraud issue that I wanted to address, and I hope this is responding to Your Honor's question. I'm in a little trouble. I think he was asking you in your role as single responsible party, not in your role as title insurer. Well, we were never hired as single responsible party for the plaintiff or the plaintiff's, well, I guess the plaintiff's predecessor because plaintiff came along later. Plaintiff's predecessor, New Horizons, never hired us. That's in the record. There's no dispute about that. And Riddlesbach, who sold the properties, never hired First American as a single responsible party. So First American is out here serving as single responsible party for others. I don't think that it has the obligation to say there's no final report because First American doesn't necessarily know that. I suppose if the DRE calls and says there is no final report, then First American knows there's no final report. But because that's not a matter affecting title, First American doesn't have an obligation to disclose that. Let me see if I understand this correctly. I've always thought of people who work at outfits like your client, they have a checklist. Are there easements? Are there other claims to title? Are there pending lawsuits? Are you telling me that the lack of a public report is not on that checklist? As far as I know, it's not. That's right, Your Honor. I mean, it might be. Because in your view, it doesn't affect title. It affects something else. That's correct. Now, it would be if First American were, for example, handling the escrow aspect of it, which First American here was not. Keep in mind also that it was Orange Coast Title that was issuing the policies on behalf of First American Title Insurance Company. If First American had been acting as escrow, one of the things on the checklist probably would have been to ensure that these individual buyers have received their final public reports from the developer. But that was not something that First American was handling. First American wasn't involved in that aspect of the transaction. Could I ask you a question about you started to talk about the fraud claims? And I explored this with Mr. Garner as well. In the most expansive view of the fraud claims here, would any claim of fraud survive if there is no defect in title and there has never been a defect in title? Your Honor, I think the answer to that question is an emphatic no. And one of the reasons for that answer is that plain and simple. There can be no misrepresentation. If title is perfect, then it's not a misrepresentation to say it's perfect. The whole basis and foundation of the plaintiff's claim of fraud and nondisclosure is that title was unmarketable because of the failure of Rindelsbach to obtain a final public report. That's the entire foundation of this case. If, in fact, title was marketable or if the lack of a final report doesn't affect the marketability of the title, there can be no fraud. But I would go a step further and I would say that under the statutes and case law in California, the law in our view is crystal clear that claims of fraud cannot be premised on an insurer's, insurer's failure to disclose something regarding title. Now, the appellate points out in reply that some of the cases that we've cited talk about negligence and whether there was a negligent title search. That's certainly the case. However, those cases also talk about nondisclosure and fraud. For example, the Seufer case at 114 Cal Reporter 3rd at pages 3 and 4 and 8 at footnote 4. The Siegel case, 54 Cal Reporter 2nd at 87 footnote 5 and 89. These are in your brief? They are in my brief, yes, Your Honor. The Southland case and the Lawrence v. Chicago title case all explain, in addition to negligence, that there can be no claim of fraud, period. The reason for that is the cases and statutes say that no one may rely on what a title insurer does or doesn't do as a representation or concealment of the condition of the title. And so if no one can rely on that, then as a matter of law, there can be no fraud. So what I would point out as well, going back quickly to the issue of the marketability of title and coverage, again, the plaintiff here is claiming title was unmarketable because of Rindelsbach's failure to have a public report. That failure was cured when the foreclosures occurred. No one can ever claim again that Rindelsbach did not obtain a final report. The problem here arose, let me step back a second, plaintiff argues that we agree that First American insured 12 separate liens. Let me point out one thing real quick here. The plaintiff said we insured fee title. The company did not initially insure fee title. The company insured liens. Those liens pay a maturity to fee title through foreclosure, but the actual insured interest is a lien interest. And that may become important in other cases when you are looking at damages between what a lender can suffer and what an owner can suffer. But here I just want to point out it was really a lien interest. Again, that matured into a fee interest. We're not disclaiming that. But the point here is that the problem arose, and we agree that plaintiff had 12 individual policies for 12 individual lots. If plaintiff had foreclosed only on one of those lots, it wouldn't be here, because plaintiff admits that as long as it owns four or fewer lots, there's no argument that it must comply with the Act. The only reason we're here is because plaintiff foreclosed and acquired title to more than four lots. That's plaintiff's theory of the case. Because they own more than five lots, plaintiff must comply. Now, obviously we disagree. Our view is that plaintiff need not comply. But the point here is title insurance, as plaintiff admits, and we agree, focuses on the condition of title at the policy date. The loss that is suffered must result from something that existed on the policy date. That's built into the provisions of the policy. California Supreme Court has explained in the Coelho main case, again cited in the brief, that title insurance does not, as a general rule, insure against future events. So the point here is to say that the unmarketability that plaintiff complains about is something that, in fact, arose years after the policies were issued as a result of plaintiff acquiring all the lots. Did First American owe a duty to disclose to New Horizons, security's predecessor, that the subdivision lacked a final public report? No, they did not, Your Honor. There's no obligation under California law to disclose that to a lender or a buyer or anybody else. It's a matter of public record. It's also a matter of public record. And, in fact, the plaintiff's own witness in declaration, Mr. Gressman, with New Horizons, testified by declaration that New Horizons didn't know that the law required a final public report. The law presumes that everyone knows the law, and that's at ER 1433. And then there's a declaration from the DRE that the plaintiff submitted at ER 1438, paragraph 38, where the DRE says, if someone had called us, we could have told them whether a final public report was issued or not. So certainly I think part of the problem here is the plaintiff or plaintiff's predecessor was out of state, dealing with in-state property. They didn't know really what the laws were, as they admit, and I think that's a failure of their underwriting as well. But that's not why we're here. If I may, because you're about out of time, I have one issue you haven't addressed. Do you still take the position that the right to sue on the title policies didn't transfer with real estate after the Sixth Circuit decision? Yes, we do, and we think that the provision in the purchase and assumption agreement in this case is different, in that the purchase and assumption agreement in this case says that, except as expressly provided in that purchase and assumption agreement, the NCUA retains the sole right to pursue insurance claims. And so I think in the reply brief, plaintiff conflates the loans with insurance claims. We're not saying plaintiff doesn't have the right to pursue remedies under the loans. In fact, we don't disagree that plaintiff is uninsured, as far as we know, at this very moment, because it acquired the loans. The question is, did plaintiff acquire the claims that had arisen prior to the purchase and assumption agreement? Plaintiff's assertion here is that the claim arose and that the fraud was accomplished when the policies were issued. So the question here is, did plaintiff acquire those interests? And in our view, the NCUA acquired those interests or retained those interests. And the only thing that the NCUA transferred to the plaintiff was the rights under the policies to go forward and to make future claims. Had there been a defect in the title as opposed to the marketability, would it be your position that they could sue your client, that they have the right to pursue a true title insurance problem against your client? Because you just said they have the policies now. They do have the policies, and that is an issue. They aren't insured. They aren't insured. It seems to me that the question is, when did that claim of loss arise? Now, the coverage, the defect in the title, what happened to it? You just argued earlier it arose later. Right. I was just going to say that the defect in the title must exist as of the date of the policy. A loss must be suffered as a result of a defect that exists as of the date of policy. In this case, the defect in title or the unmarketability of title as plaintiff asserts arose later. Yes, that's correct. Thank you, counsel. Thank you very much.  Thank you, Your Honor. I'd like to address a couple of the issues that were raised. Regarding the transfer of the claims pursuant to the Purchase and Assumption Agreement, Paragraph 6 not only states, except as others expressly held herein, which is Paragraph 5 of the Purchase and Assumption Agreement is just such an express exclusion. It's very broad. I agree. It's very broad. As well, Paragraph 6 states that it's pre-liquidation losses, and in this instance, there was no possibility of discovering from security service and as the record, that the loss had occurred. The fraud of First American in holding itself out, and this is a really two-cute-by-twice, they didn't do anything as the single responsible party. They do that for nothing? No, they do that for one reason. They provide that service so that they can then have the business to issue these title insurance policies. They do that service because they have the expertise and the knowledge to assist the developers, and the entire process relies on their expertise to do that. Is there anything in the record that shows they were a single responsible party for Rindelsbach? The single responsible party status of Rindelsbach is not, they were the single responsible party as far as the DRE was concerned, and that is in the record. As far as Rindelsbach is, no, Your Honor. They assumed that responsibility, they maintained that mantle, they did not disclose to anyone that they dropped that mantle, and then in the same series of transactions, they then issued the title insurance policies. Their files contain all of that information. Their files contain the fact that they initiated to be the single responsible party, their files reflect that they didn't do it, that they received letters from the DRE that they were the single responsible party, and then they issued title insurance policies, and then they say, but we don't have liability. Well, the cases that discuss about their liability for nondisclosure talk about cases where they were acting as the abstractor. This is not where they took on the responsibility or the helm of the abstractor to say, your title's good. This is where they took on the helm for their financial gain to be the single responsible party. It's a loss leader for them. They take in the business, they do the business, so that they can then issue title insurance policies, and in this instance, their failure to do so created a circumstance where the title was unmarketable. To distinguish and to say that the title in this case is not unmarketable is to render that provision of the title insurance policy. Do you agree or disagree with Mr. Squire's assertion that had you chosen to foreclose on only one or two or three properties, you would have been able to sell them without any limit? I agree, Your Honor. But Mr. Squire doesn't get to dictate that. Mr. Squire issues title insurance policies, and then claims arise. Doesn't that suggest that the title itself is perfectly good and that it's only a land-use regulation that causes the problem? No, Your Honor. In this instance, I again agree. Every aspect of this title is perfect, except for the fact that it's a fee. And he may say that they were only insuring a lien, but you read the policy. They insured a fee. They insured a fee, which then we got, and now as a result of the circumstances of the foreclosures on 12 of the lots, we can't sell them. If we can't sell them, it's not marketable. This isn't a question of selling them for less individually, for selling them for less. This is a question of we cannot transfer them subject to penalty of a crime. Thank you, counsel. Your time has expired. You have one more point? One quick point. As far as the exclusion is concerned and the exception to the exclusion, Your Honor, that you brought up, the exception to the exclusion is whether or not this is a public record. As the court has acknowledged, it is a public record.  They had actual knowledge of this defect. Thank you, counsel. We appreciate the arguments from both counsel. They've been very helpful. The case just argued is submitted.
judges: Sedwick, Hawkins, Graber